Whenever you all are ready, I call 16-20472, Liberty Mutual v. Servisair, and Mr. Golenbach, we'll hear from you first. That is correct, the correct pronunciation. Oh, good, finally got one right. It's very rare. I got Griffith right, too, on the last case. Very rare in the case of my name, but may it please the Court, my name is Jeffrey Golenbach. I represent the defendant's appellants. Servisair, in this case, not quite as interesting a case as the one you just heard, because it has to do with a workman's compensation insurance policy. Just to get to the main issue right up front, a question I think that the Court has to determine and the District Court had to determine, is the policy language in this case unambiguous, or is there any ambiguity? And the answer to that question, as you can expect coming from my side, but in fact if you look at the policy itself, is not only is the language of this policy not unambiguous, it's incomplete. It's not even sufficient to figure out how one is to determine what the premium is going to be under the policy. The policy itself has a provision... Okay, but can the policy not reference another document? Your Honor, certainly a policy might not reference all documents. The problem here is the policy does reference a number of documents. Okay, so let me ask you specifically about the manuals. You all talk about the manuals. Where are they in the record? Your Honor, I'm not sure whether those manuals, which are, I mean, they're huge. I have had the unfortunate experience of going through them, but they have nothing to do with the issues in this case. So, for example, those... Well, it says the premium will be determined by using Liberty Mutual's manuals of rules, rates, rating plans, and classifications. So if you all have the manuals and the other side has the manuals, everybody has the manuals except us, what do we do with the fact that we don't have the manuals to look at to see if they are or aren't ambiguous or complex or hard to follow or impossible or whatever the right standard might be? Your Honor, I think if you had the manuals in front of you, and there was a reason why they weren't submitted to the district court, because they don't have anything to do with the dispute here. Those manuals... So you're not relying on the manuals for any ambiguity. You're saying the policy itself has ambiguities. Correct. In fact, the manuals don't deal with the principal issue in this case. So what the court needs to understand, it took me a long time to understand how the workers' compensation premium was determined and calculated in this case. And if you look at the Part V of the policy, which tells you how to do it, which, as Judge Haynes just said, it says all premiums will be determined by our manuals of rules, rates, rating plans, and classifications. Those are four things. Rules aren't an issue. Okay, so are there such manuals? There are manuals, but those manuals don't relate to the real issue in this case. That issue in this case, if I may be so bold as to say, what really happened here is that the rating plan, the way the premium was determined is something called a loss rating plan, also a guaranteed cost plan. None of those things are defined anywhere in the policy, in the manuals, or so on. And how they get to the premium is as follows. The company, in this case Service Air, gives information to the insurer, Liberty Mutual, saying here is our payroll, here is the total amount of the payroll, which is approximately $100 million, and here are the employees that we have, and they're in certain classifications. That information was given to Liberty Mutual. The information is then fed into a computer. The computer spits out this big, long thing that says, okay, we've got so many clerical workers and so many this kind of workers, and so on and so forth. And by state, it then says, okay, here's the classifications, this is the code, the classifications, the rates, it multiplies it out, and so on. What then happens, and then you get something that's called a manual premium. It's just a number. It's not the final premium by any means. It's a number. And what that number is, is if you take those employee classifications and codes and multiply the numbers out, you get a number. In this case, it was about $5 million. Those numbers and that printout is then sent to Liberty Mutual's underwriter, which in this case is USAIG, United States Aviation. This is a company that knows the aviation industry. And they have an underwriter who testified in this case. His name is John Matthews. And here's what he said about how he figured out what the premium was going to be. He didn't just take those numbers and then add 25%. And you'll hear about the 25% has to do with the scheduled debits that you've read about. He didn't do that. What he did was he took the loss history of Service Air. Service Air is a big company. It had $100 million in payroll. And he took the loss history over five years, and he did his own analysis, and he determined that over the period that Liberty Mutual was going to be insuring Service Air, that the likely claims that would be made, that is the losses, expected losses, would be a certain amount. And he added to that certain amount a number that would constitute the profit that Liberty Mutual wanted to make on the policy. He then came up with a premium number. That premium number, in this case, this is the second of three policies, in this case, was $6.2 million. He then took the six. I thought the premium number was based on the adjusted employment records, how many people were handling baggage versus sitting at their desk. Doesn't that just go to motive? That's what led him to reach that calculation? No, that's not what the evidence is. He took the $6.2 million, which is the premium that he wanted to charge. He then looked at that printout. The printout that came from Liberty Mutual, which had come through Service Air to Liberty Mutual, and it said $5 million or $5.3 million. And as he testified, because he wanted to charge $6.2 million in premium, he then added what are called scheduled debits. Those are totally discretionary. You can't find a ‑‑ there's not an actual schedule that says here's how much you add, here's how much you subtract. There's a debit or a credit, and it's somewhat counterintuitive. In this case, the debit means he wants to add more premium because the number ‑‑ I think in the district court, this was really that the calculation itself was really even the focus of the disagreement. I thought it was all on whether these clauses were inconsistent, whether there was this even ‑‑ you were arguing, as I understood it in the district court, that there was no right to even adjust. This was just a, you know, the price paid at the beginning wasn't an estimate. It was the final price. No, that is not what we were arguing, with all due respect. We didn't argue that. What we argued is that the policy ‑‑ Well, you're pleading, certainly, before it got teed up for summary judgment, that that seemed to be the position. Look, we had this first guaranteed rate policy, and then we got this second policy, and we didn't realize it had changed so that they could make this adjustment. Your Honor, our pleadings when we started the case were different somewhat, admittedly, from what we argued after we found out what all the facts were. But to get to ‑‑ to try and answer your question, what the underwriter did was he said, okay, I want to get to $6.2 million, so I take these manual numbers, and I'm going to add what's called a scheduled debit of $993,000 in this case. So you're not disputing ‑‑ I know you have this mutual mistake, which is a separate issue, but other than that, you're not disputing that they could adjust when they realized that there were blatant misrepresentations about what types of jobs these folks had. You're not saying they didn't have the right to adjust. You're just saying they didn't adjust properly. They didn't adjust properly. What they should have adjusted for was the difference in the overall payroll, which, by the way, was relatively insignificant. But you're saying they could not take account of the fact that you had misrepresented, your client had misrepresented how many people were in baggage, where there's much greater injuries than sitting at their desk? I will take some issue with the word misrepresented, which has an intention implied there. Misstated. Misstated, okay. They did not ‑‑ they did misstate. Yes, they did. But the underlying code classifications and the allocation of payroll was irrelevant to the way the premium was set. This is a policy, and the court should understand, that this is a form NCCI, National Council on Compensation Insurance Inc. This is a foreign policy. This foreign policy is used by companies that have $100,000 in payroll, $100 million in payroll, and $1 billion in payroll. Okay, so it's a big deal if we were to find this policy to be ambiguous because then we're basically negating thousands of policies, not just yours. And your whole argument, other than mutual mistake, is premised on ambiguity and on there being a problem with the wording. What does guaranteed costs mean? What does this and that mean? Now, all of a sudden, your argument is a math argument. Well, could have been five, but it was six, and instead was eight and was two and all of that, which is a math argument about, yeah, you can recalculate, but you recalculated wrong, and it's really this other number. And that's a different, I mean, you can think what you think of your briefs, but it's a different argument than the one I read. We'll put it that way. I'm not saying it's nowhere lurking in your briefs. I'm saying the main argument I had understood was a mutual mistake and the fact that there were these undefined terms and problems with that. Well, Your Honor. Now you're telling me it's a math case. Maybe I have misstated my position here. What I was trying to explain to the Court is that the policy is ambiguous in this case because it is incomplete and doesn't explain how you get to the premiums. So the reason we lost below. And then we get to the manual issue, and I had heard you say, and maybe I misheard you, that the manuals don't matter. And frankly, I think when you're on appeal, if there isn't record support for what you're arguing, that goes against the appellant. I mean, I think if we're missing a record in a case, that cuts against the appellant because you're the one saying the district court done wrong, and if we don't have any record to show did or didn't do wrong, we're where we are. I hear you, Your Honor, but we're not saying that if you looked at the manual, you'd see the ambiguity. If you looked at the manual, you'd see that it has nothing to do with the scheduled debits or credits. And what happened here is that the premium was set based on the loss rating that the underwriter made, and the debits then were added to the manual premium. What happened at the end when it was discovered that this was a mistake, and both sides thought it was a mistake, understood that it was a mistake, and both sides thought these numbers were accurate when they were used to set the premium, what happened here was all Liberty Mutual did was mathematically, through its computer, spit out another bill which used code classifications and rates, but didn't take into account the fact that there were scheduled debits that were used to adjust that manual premium. The original reason that there were scheduled debits added to the premium was because the manual premium wasn't high enough to get to the Liberty Mutual loss rating that they wanted to charge. So what should have happened here, at the very least, is instead of being scheduled debits, there should have been scheduled credits, which would reduce the premium, and that didn't happen. But let me talk about mutual mistake because I don't have that many minutes left to talk. The court below said that there is not a mutual mistake here, primarily because I think of two reasons. One, it said that the estimate was irrelevant because, according to the policy, the final premium is set after audit. So therefore, the estimate has nothing to do with it, with the policy premium, and therefore, the mistake was not material to the parties. And I beg to differ in that. The evidence shows, if we could prove it, we tried to argue it to the court below, is that the premium that was set was the crucial fact that led to the parties agreement. Yeah, but I think the problem is that on that, that you have a guaranteed cost provision, and so that puts any mistake, if you will, on you, or maybe on them, because if the mistake goes in your favor, you get money back. So it's already accounted for. In other words, I think I'm going to be charged $1,000 for my car insurance, but they say, but we're going to go and check your car later. Then I know, well, maybe that's going to change. Your Honor, I understand it was a mutual mistake. In this case, it inures to the benefit of the insurer, but it was material to both of us. No, no, it's not a mistake. The point I'm making, like, I just did this. We just got a new homeowner's policy, and they said, well, this is the premium we're setting based on what you've told us about your house, but some guy is going to come and walk around your house, and it might vary the premium. So I understood that instead of it being, I don't remember what it was, $1,000, it might be $900 or $1,100. I knew that was coming down the pike. So how can I say that's a, even if I relied on the $1,000, I wouldn't have changed coverage if it wasn't the $1,000 or whatever. How can I say that's a mistake when I know it could change? I can tell you that that argument, which certainly is what Liberty Mutual is arguing, ignores the reality of the situation and the evidence and Mr. Matthews' own testimony in which he testified, and he was the one who set the premium, and there were lots of insurance companies bidding for services. He testified the code classifications and rates were immaterial to setting the premium. Nobody cared about that. What they cared about was the $6.2 million that was being quoted because there were other companies also based on loss rating and loss history who were quoting $7 million or $7.2 million. That's an argument that they breached the contract, that the contract was they could alter the premium based on finding out the true facts, but they just didn't do that. That's a different argument, and to be fair, you do have a lot of math in here. What I meant was that the math seemed to be directed to this confusion over the guaranteed cost. Now you're saying really the case is we understand the policy, it's just they didn't follow it. Is that a better way to characterize what you're arguing? What I'm saying is the policy cannot be read unambiguously because you cannot even read the policy to get to the premium that was charged either initially or in the end, and in order to do so properly, you need industry information as to how these policies are applied in the industry, which is contrary to the way it was done here. I'm sorry, I've run out of time. Thank you. Good morning. May it please the Court. Sean Jordan and Chris Thompson for Liberty Mutual. I think at the outset, Judge Haynes, to your point and to some of the questions from you, Judge Costa, it's important to clarify just why Judge Smith correctly found that there is actually no ambiguity in how these premiums are calculated. The Part 5 of the policy specifies how premium will be calculated and specifically references what is known as the Item 4 extension of information page in the policy. And when the Court looks at that, and I urge the Court to look at these pages in the record, this is a record on appeal pages 449 to 466, 18 pages that describe in detail precisely the formula that will be applied by state, by classification code. Okay, let me, because I'm a little bit confused. I thought they were claiming an ambiguity in the policy, at least in what guaranteed costs meant and some of this other stuff. Now I'm hearing him say, well, you all didn't even follow the policy, which is to me a slightly different argument. It could be that the policy allows you to go back and say, well, you told us too many clerical and not enough baggage handlers and we can readjust, but that that's not what you did, and to me that's a different case. That's what I'm calling the math case, which I don't mean to demean that. It's just a different case because it allows you to recalculate the premium, but you have to do it properly under the policy. I had thought this was a case, again, putting aside mutual mistake about we can't tell what the policy requires. So which one is it? Can we not tell or is it a math error? And I realize you're having to tell me what your opponent is saying, but I found the argument today a little bit inconsistent with what I thought the case was about, and I could have just misunderstood. So that's why we have oral argument. Clear this up for me. Right, Judge Haynes, and I will say that with all respect to my esteemed colleagues, I think there has been some confusion in their arguments, and it may help to have a little bit of history that goes to Judge Costa's question, which is remember that in the beginning of this case when they filed their answer and all of their answers to interrogatories and everything up to when we filed the summary judgment, all the discovery for a year in this case, their argument was very straightforward. It was this was a policy that is a composite rate policy, which meant basically along the lines of what he has, I think, suggested today and suggested somewhat in their briefing that it's just straight up payroll and one flat price that applies across the country, you know, $5.68 per $100 of payroll. That was their argument, and that was their argument all the way up to summary judgment, right? But the problem for them was all the evidence in the case conclusively disproved that. Witness after witness said there was no such agreement, and it was obvious there was not a composite rate agreement that rather consistent with what I will go through in a minute, which is the plain, explicit, and detailed language in the policy that what was the way that the policy would work is the rates would be based upon worker classification codes and payroll. So we get to the summary judgment. We file a summary judgment on the composite rate argument, and then they completely shift gears. They abandon the composite rate argument and instead come, Judge Haynes, with an ambiguity argument, which I think is, as you said, what we thought they were saying in the briefing to this Court, which is not the math is wrong, but no, this policy is ambiguous, and, you know, their math isn't right because this extrinsic evidence showed it should have been a completely different basis. What I will tell the Court very straightforwardly is Judge Smith got it right. The math is not wrong. There is a formula. The formula is set forth in detail in the policy at pages 449 to 466. And remember, this is an estimate of premium, and how we estimated the premium is set forth on those pages in detail by worker classification code with the rates there and, guess what, with the scheduled rating also put in there. Okay, but he's saying your guy testified. I threw that out the window and just said, hey, I want to make this much money, so let me just get there. And, see, that to me would not be a problem with the policy. It would be a problem with a breach of the policy, a failure to follow the policy, which is the math error that I'm or the math problem that I'm hypothesizing. But really it's, to put it in legal terms, a breach of contract, not a problem with the contract. Judge Haynes, I'm going to call out what that is. That discussion is just a plain red herring. And here's why it's a red herring. Let me explain why it's a red herring. Because that is a complaint about how our underwriter arrived at the schedule rating. In other words, what did he do to consider what to come to the schedule rating that's part of the formula? And as the district court judge recognized, how we arrived at the schedule rating doesn't matter. What matters is, was it disclosed? Did they know what every schedule rating was and did they agree to it? And they did. And if you look at those pages of the policy, at pages 449 to 466, we disclose every schedule rating. So when he's saying, this guy, I thought of this or I didn't think of that, well, look, a lot of calculations go into underwriting. When he's talking about what went into the schedule rating, that's irrelevant for this Court. What matters for this Court is, was it unambiguously in the policy? Under Texas law, we know that an unambiguous policy, just like any other contract, will be enforced on the written terms the parties agreed to. So you're saying it's just like for life insurance. Obviously actuaries decide, well, this is how people are expected to live this long and this is what we need to set the prices at for the insurance company to make money. You're saying that all goes to the rates. What he's pointing to is how they came up with the rates, but the rating plan is part of the policy they agreed to. The formula, this is critical, Judge Costa. The formula did not change. Remember, this goes to your example, Judge Haynes. This was an estimate. Part E of the policy, this is at page 439 in the record, expressly says, this is an estimate, not the final premium. The final premium will be determined when we do an audit and we look at your actual payroll and see what our actual exposure was. And so all that matters ---- But he's now saying you didn't do that. You didn't do that to come up with the original premium. You didn't do it to come up with the revised premium. You just made up a number. And, therefore, that to me is not an ambiguity in the policy. It's a breach of contract. Right. And, Judge Haynes, there is literally not only is there no support in the record for that, actually the record conclusively disproves that. And let me give you the pages. Okay. Again, Judge Haynes. So here's what you need to look at. Again, I know I've repeated these pages, but here are the policy pages. He's talking about evidence in terms of testimony from your guy saying, I got something off a computer, threw that in the trash, and just went off and decided to make this $6.2 million. And so he's saying it didn't really matter what was in the policy, ambiguous or otherwise, because it wasn't followed. Right, Judge Haynes. Let me parse that out into two parts. What he's talking about there, again, he's talking about how they arrived at the schedule rating piece of the formula. That's all he's talking about. But the schedule rating that we arrived at is disclosed and was followed throughout. It was followed at the estimate stage, and it was followed in the audit stage. Let me give you the pages for the audit. So there's coming up with the rate and then applying the rate to their employment figure. That's exactly right. So there are two separate steps. And you're saying what he's complaining about is the first step, how they came up with the rates, but not how the rates were applied to their employment figures. Right. The district court put it aptly. He said it doesn't matter. The district court said it doesn't matter what the motives were in arriving at the scheduled rate part of the formula. All that matters is that the entire formula was, A, disclosed to Service Air, and, B, followed, strictly adhered to. And the record demonstrates both of those are true. So you have to – So the math is applying the rating figures to their new payroll numbers. That's exactly right. That's the math that had to happen. Judge Colson, that's the only thing that changed. Everything else about the formula stayed the same. It had to stay the same. We could not change the formula. So in other words, the formula that is in those pages in the policy, pages 449 to 466, 18 pages by state detailing all this, including the schedule ratings, when you look at the audit at pages 284 to 296 of the record, you'll see that we followed through on that. In other words, the only thing that changed, to your point, is they gave us the wrong numbers. And the importance of them giving us the wrong numbers, I think both you and Judge Haynes have pointed out, meant that our exposure base was much larger than what we had estimated. And that's the whole reason why you have a final – Sorry. So I'm actually, by the miracle of technology, looking at page 449. So I'm seeing that it's got these different places, California and Florida and all of this, and then it has class code, payroll, payroll per 100, estimated premium. What is it in this that you think your opponent is challenging? Which column of this thing I'm looking at? So I'm going to give you my best understanding, because I will admit that I am sometimes confused as to what exactly their argument is. Here's what I think their argument is. What I think their argument is is where you see Judge Haynes on that page, near the bottom, the schedule rating number. You see that schedule rating on the left-hand side? It's near the bottom. It's probably the third line up from the bottom, just above standard premium. Okay, yeah, yeah, I see that. And if you go across, you see the .25, right? Right. Okay, that is the disclosed schedule rating. And, you know, we lawyers aren't great at math, but if you go back, and I urge the Court and your staff to look at this, what you'll see happens is that .25, yes, it is increasing the estimate of premium, because what it's saying is the premium number that was devised before that, the modified premium, you multiply by .25, that number, and what you find is you get an addition of 539,000 to the estimated premium. That's the schedule rating. That's going to be applied at the back end, Judge Haynes. So, in other words, we couldn't change that schedule rating. Like, we couldn't say at the back end, you know what, we don't want .25. We like .50. And so we couldn't, when we did the final premium, say, you know what, let's jack that up to .50. The reason the numbers were bigger at the end didn't have to do with us changing anything in the formula. It's quite simple. When you take that .25 and you multiply it by a payroll that was wrong because it had lower exposures, the reason that it's much higher is because the exposure is higher, so the premium number, right, it was being multiplied by a much bigger premium number. We did the math correctly. In fact, honestly, Judge Haynes, they don't dispute the math. They don't dispute that our numbers were accurate under the formula we have. Okay, and so what you're, to try to sum up, your argument is that this scheduled rating number, this .25, however derived, was disclosed to them at the outset. And so if it was derived by somebody flipping a coin, it doesn't matter because if I walk into a store and it's $5 for a cup of coffee, I just have to decide if I want that cup of coffee or not, and it doesn't matter whether $4.99 of that is profit and one cent is the coffee bean or vice versa. But I'm being told $5. If I'm suddenly charged $6, then I've got a different issue. But if I'm charged $5, I know I'm being charged $5, I don't get to decide how do they come up with the formula. That is exactly right. Is that a really oversimplified argument? No, no, that is a great analogy, Judge Haynes, the reason being that that's exactly what's going on here. You don't care what the price of coffee beans being imported from Columbia was or how much the equipment cost at Starbucks that went into the price. What you care about is did they tell me this is going to be the price and was I fairly charged the price? Now here, and that's why what's critical here is this part 5E where the parties specifically agree. This is an estimate of premium. We know there's going to be divergences. And, look, there might be divergences in servicers' favor. In fact, part 5E, and you noted this, Judge Haynes, it might go either way. What they can't say and what the record conclusively establishes they would be wrong on is that we didn't use exactly the formula that's in there, we comply with the numbers, and candidly until today and this bit about math, there hasn't been any dispute about that we used the correct formula and the correct numbers, so much so that if they had given us the correct numbers at the outset, right, the correct classification codes for the workers with higher exposure, we would have had, we would have applied the schedule ratings, and that $3 million would have been on the front end. We did the math correctly. But that gets into the mutual mistake where he's saying, like going back to my hypo, semi-hypo of my homeowner's policy, if I'm thinking, well, it's $1,000 or maybe it'll be close, $1,001, and then all of a sudden they hit me with, well, we didn't like your neighborhood, so now it's $2,000, then I would go, whoa, I wouldn't have done it if I'd known that. That's kind of what he's saying, that, okay, maybe you know there'll be like this slight adjustment, but suddenly you're walloped with this huge change, and we wouldn't have changed policies to you guys if we'd known you were that expensive. That's fundamentally his argument, kind of like my homeowners. And, again, I'm making up these numbers. I don't remember the exact amount. But if I thought I was going to pay $1,000, then I make that switch to this new company, and then I'm suddenly hit with this giant change, then I'm like, whoa, I would have stayed with the old guys if I'd known you were going to charge that much, even though I knew you might make an adjustment once you walked around my house or whatever. Right. I think a couple of critical points on that, and I think, again, the district judge got it right as to why that argument fails under Texas law. The first reason, I think the first reason it fails is that the parties expressly anticipated in this agreement. You know, we've all got Texas judges here. We all know that Texas cases say over and over and over again, this is a remedy that rarely applies, and you have to show somehow that the original intention of the parties that everyone was clear on somehow didn't get reduced to the writing. Well, the intention of the parties here was this is an estimate. It's going to diverge. And, in fact, what the district court quoted, I think correctly, and many Texas cases say, and I'm going to quote you from the City of the Colony case that both sides cited, it's a very quick quote, says an error in predicting a future fact known to be uncertain is not the kind of mistake that will relieve a party from a contract. This was known to be. Well, the future fact is within their knowledge, not yours. Right. They know. They have a better grasp on what their employees are doing in terms of job classification, and it's also not a case the factor that changed the premium is known. Everyone knows it's going to be based on these updated payroll numbers. That's exactly right, Judge Coffs. And that's exactly what the district court found is, look, they were in the best position to know what were the correct payroll classifications and what their work was. I mean, we're not going out to their ramps at the airport to figure out who's working under jet engines and who's working back in the clerical. We're relying on the information they give us in their payroll. And as this court's aware, they acknowledged below, they acknowledged in the briefing before this court, that error was solely theirs. And so the district court said, and this is consistent with Section 154, the restatement. We know Texas has adopted Section 152 in the succeeding sections. It's consistent with Section 154, which says where an error, the burden of an error should be placed. Here it was squarely and properly placed on their shoulders. I would note, you know, one other point, and this, you know, has to do with, think of the remedy they're asking for. Okay? There's a fundamental problem right there because they're saying they want to void this entire agreement. But guess what? They've already gotten all the coverage. We met our obligations. And the fact of the matter is. It's always hard with insurance because you're only glad you have it when you need it. And then all those years that you paid and didn't need it, you're like, boy, that was a waste of money. So that is a problem inherent in people's perception of insurance. I'm not blaming you for that or your opponent. Right. As you say, at the front end, they wanted the coverage. They got the coverage. Although I'm sure you made some payment of claims. I realize it's not maybe like my auto policy where, thank God, I haven't had to get any claims made on it. But nonetheless, as you say, then once that time has passed, there's no way to reset that and go back to the beginning. Right. And, in fact, I'm going to quote the Walmart v. Chris case that they gave and then Judge Costa's case. I want to get to both of them. The Bear Ranch v. Hartbrand case. But I want to start with the Walmart v. Chris case where that's the case they cited to. But it's unhelpful to them because what Walmart v. Chris says is both the insurer and the insurer deliberately, deliberately falsified the payroll of Walmart in order to get to a set premium. So they all lied to the state. The court said in that case this agreement is entirely illegal and unenforceable. And that's why Walmart didn't have to pay any more premiums because they used the concept of impari delicto. If you're part of a culpable and illegal contract, you get no relief. Like the contract for a sale of cocaine or something. Right. But an important part of that case is where it says, look, Walmart wants to separate out coverage from premium in terms of what's illegal and unenforceable. And the court said you can't do that. If the contract is illegal and unenforceable, then it's all gone. You can't pick parts of it and say, let's keep this part in place and just render the other part illegal. And that brings me to the Bear Ranch case that we cited to, which admittedly, you know, is from Judge Costa when he's on the district court bench, which was a fraudulent inducement. And on appeal, though. Don't say that yet. I'm sure it's brilliant. Don't make it right. I think on this point it will resonate because the problem and I'm only talking about the particular part of the case where one of the parties wanted to get a partial rescission of the agreement. They were trying to say that based on the fraudulent inducement of the other party, they could pick and choose which parts of the contract should be kept in place. In other words, don't void or rescind the entire contract. And I think Judge Costa appropriately said, you know, you can't do that. You can't have a remedy that says we're going to pick and choose. But that's exactly what ServiceAire is trying to do here. There's been nothing in the record about are we going to go back and see all the claims we paid? I mean, after all, we had a much larger exposure base. So all I'm saying is there's a reason that you hold parties to the unambiguous terms of agreements. Let me just ask you the same question about the manuals. Is there anything we need from the manuals? Because I don't think we have them. I haven't found them. And so are we clear that the manuals themselves would neither create nor resolve any ambiguity that might be out there? Judge Haynes, let me close the circle on that one. First of all, all that Part 5A says, the short answer is no, you don't need them. Here's what we know. Part 5A says the rates that are going to be in this contract are going to be consistent with and guided by our manuals. We then go through for 18 pages and say exactly what those rates are. They have not submitted any evidence to show that there's any inconsistency or any problem under our manuals. And the only testimony in the record, which is at pages 1060 to 1062, which is the Affidavit of John Matthews, establishes that the rates were done precisely consistent with the manuals. So the only evidence in the record is that it was consistent. To your point, Judge Haynes, it would have been on them as the appellant to put the manuals in and try to show how what we did was inconsistent. They didn't do that. They're not in there. What is in there is the unambiguous language that this Court can trace from the binder through the policy and go on through to the audit. And you will see that we followed the math, we followed the unambiguous language, and Judge Smith correctly determined that this contract should be enforced as written. If there's not any further questions. Okay. Wow. Well, your opponent's raring to go, so let's hear from you, Mr. Golenbach. Well, and we appreciate it. We're glad to have you, and we appreciate your argument. So please, tell us where we've all gone astray here with your counsel opposite. How did he lead us astray? Well, I think, Your Honor, the counsel made one telling argument that I have to talk about here. What he said was if the parties had known about these code classifications in the beginning, that $3.5 million would have been known up front instead of at the back, and that's not true. Because the evidence is, and Mr. Matthews testified, and you can find the excerpts of his testimony at 992 and 993 of the record, and he said that they used schedule debits here because the manual premium wasn't high enough to reach what his loss rating was or what's the estimated future losses. Because they wanted to charge $6.2 million because that's what they thought they needed to make a profit. But do you agree with him that that motive went to this .25 schedule rating? It goes to the .25, and what's telling about that is if the parties had known. When did you know about the .25 schedule rating? Three years later. Oh, when did we know about the .25? Oh, we knew about it. If we had understood what it was, we would have seen it. Okay? At the time. At the time. It was disclosed at the time. It's actually disclosed in the binder. Okay. But schedule debits are intended to increase the premium to get to the loss rating. If the parties had known that the manual codes, the manual premium, just code times rate, was $8 million instead of $5.2 million, which was approximately the difference, then as Mr. Matthews testified, he would have not applied scheduled debits. He would have applied scheduled credits, which would, as I said, it's sort of counterintuitive, but they would have been credits to us. They would have reduced the premium. So there wouldn't have been $3.5 million extra known in the beginning. It would have actually reduced the premium. It would have been a negative 25%, not a positive 25%. You still would have gotten to the $6.2 million. So we're not saying the math is wrong. We're not saying that the 25% But how do you get to retrade the deal on how much the .25 is? That's what I'm having trouble with. We're not retrading the deal because the parties, there were three policies here. The first policy, second, third. The first one, there was an e-mail that was outside the policy that said this was the deal, X dollars per hundred. The second one is, as we say, ambiguous. And the third one was we're going to have in between 6.2 and $7.1 million is going to be one of those. In between those, depending on payroll. All three of those policies, the premiums were pegged based on payroll, the amount of the payroll, not the allocation by code classification, but the amount of payroll. And that was the deal here. And it's very clear from the testimony of Mr. Matthews that that was what was the underlying deal. All right, so to boil it down, your argument is that the change from finding out that these weren't all clerical, but rather they were people engaged in a riskier line of work, should have made no difference. It should have made no difference because it didn't It's not really an ambiguity argument. It's a breach of contract argument. It should have made no difference because you failed to calculate this the way you said you would. And if that's wrong, then there's an ambiguity. It's an ambiguity argument to the extent that the Liberty Mutual is saying that you can look at the policy and determine from the policy exactly how you are to come up with the premium. You can't do that. You simply cannot do that. The policy doesn't say that. This is a policy that the evidence will show. Did you disagree with his analysis of 449 to 466 that we just went over? If you look at it, which I assume you will and have. Well, I'm looking at it now. Okay, what you'll see is there is schedule rating .25. There's no doubt about that. We've never denied that. And if you multiply .25 times the numbers, you're going to get another 25%. But what does that mean? What that means is that Liberty Mutual quoted and included a scheduled debit in order to bring up these manual premiums to their loss ratings. And why are the manual premiums in there anyhow? They're not in there to set the premium. They're there because the state requires them to be there. And the insurer has the right, under the law of all of these states, to adjust the manual premium up to 50% higher or 50% lower. So in a case like this where you have a large insured, you can adjust what would otherwise be manual premiums, which are never adjusted for the small employers, to get to the loss rating. And that's what the parties did, and that's what they expected was going to be done at the back end. So they're trying to take advantage of a form insurance policy that doesn't fit. Thank you. Well, I appreciate it. Well, thank you. This is a very spirited argument. We appreciate both sides and your cases submitted.